The **COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION**, Complainant,

v.

**LeRoy J. STURGEON, Respondent.**

No. 92–528.

Supreme Court of Iowa.

July 22, 1992.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Patrick C. McCormick, Sioux City, and LeRoy J. Sturgeon, pro se, Sioux City, for respondent.

**PER CURIAM.**

As one court succinctly put it, "Occasionally a case arises with facts so egregious that although tragic, they cry out for disbarment." *In re X*, 120 N.J. 459, 460, 577 A.2d 139, 140 (1990). This is one of those cases. We reject the Grievance Commission's recommendation for suspension in this lawyer disciplinary proceeding and revoke the respondent's license to practice law.

**I.  *Factual Background.***

The respondent, LeRoy J. Sturgeon, obtained his license to practice law in Iowa in 1977. For the next twelve years he was an associate in a general practice law firm in Sioux City. At the time of the incident which precipitated this proceeding, he was engaged in a solo practice limited primarily to criminal and family law.

The respondent married Dale Bahmer Sturgeon in 1988 after the birth of their daughter. The marriage was essentially a long-distance relationship. This was due to Dale's (1) incarceration on criminal charges at the time of the marriage and (2) subsequent enrollment in a three-month-long inpatient substance abuse treatment program.

After Dale completed the program she and the respondent lived together for a short period of time. The couple then separated permanently.

The respondent filed for dissolution in June 1990. At this juncture his personal and professional life began to unravel. He began drinking heavily.

On July 9, 1990—after drinking all day—the respondent called Dale and asked her to come to his office after work. She did so. During this meeting the respondent announced that their relationship was over and that he could have no further contact with her if he wanted to stay well. Dale left without protest. Her resignation sent the respondent into a tailspin. He began drinking again.

Later that evening the respondent called his brother Marlin. Marlin lived in Holstein, some forty-five miles from Sioux City.

The respondent's tone and certain statements he made alarmed Marlin. The re-

spondent told Marlin that he had a "hate list" and two guns and that he was going to shoot the people on the list. Marlin then called Mark Sturgeon, the respondent's nephew, who lived in Sioux City. Marlin asked Mark to go to the respondent's office and check on him. Mark did so.

Mark arrived at the respondent's office to find the respondent and David Bahmer—Dale's brother—present. In the ensuing conversation the respondent revealed a clandestine plan to Mark. The respondent denies any conscious memory of this conversation.

The respondent had indeed drawn up a list of five people he wanted to shoot. The intended victims had, in the respondent's view, harmed Dale in some way. The respondent told Mark, "These people on this list are either going to die, or I am."

One of them was a district associate judge. The judge earlier had presided over Dale's reconsideration of sentence hearing and denied reconsideration.

The respondent asked Mark to become his hostage on a car trip to Spirit Lake, where the judge resided. Once there, the respondent—according to the plan—would shoot the judge. This accomplished, the pair would return to Sioux City. The respondent would then shoot the remaining individuals on the list. These included: (1) Dale's two sisters, who the respondent believed were partially responsible for Dale's failure to abstain from drugs; (2) two alleged drug dealers the respondent blamed for Dale's drug addiction; and (3) an assistant county attorney who was initially assigned to prosecute Dale's case.

Mark apparently convinced the respondent that he would take no part in this scheme and left the office.

The respondent and David remained. The respondent tried to convince David to become his substitute hostage. David suggested instead that they go to a bar and get into a fight so the respondent could vent his anger. David then walked to a favorite bar that was several blocks away.

The respondent would not be mollified. In a telephone conversation with one of the two sisters on the list he said, "I'm coming to shoot you." He then walked from his office, purportedly to meet David. But the respondent was armed with two loaded thirty-eight caliber revolvers. The revolvers were not loaded with ordinary ammunition; they were loaded with hollow point bullets. He had no permit for either weapon.

A short time later the respondent was arrested by Sioux City police officers near the home of Dale's two sisters. He had unsuccessfully tried to break down their front door.

Armed with a search warrant, the police seized the victim list from the respondent's office. The respondent was jailed and bail was set at $480,000. Unable to post bail, the respondent remained in the county jail for about eight and one-half months. During his confinement the respondent was temporarily transferred for (1) psychiatric evaluation at Oakdale Medical Classification Center in Iowa City, and (2) substance abuse treatment in the chemical dependency unit at the Mental Health Institute at Cherokee.

On July 17, 1990, the respondent was charged in a four-count trial information. Two counts were for going armed with intent, each a class D felony. *See* Iowa Code § 708.8 (1989). Two counts were for carrying a concealed weapon, each an aggravated misdemeanor. *See* Iowa Code § 724.4.

Under a plea agreement the respondent pleaded guilty to one count of going armed with intent and one count of carrying a concealed weapon. The plea to going armed with intent was an *Alford* plea. (An *Alford* plea allows a defendant to plead guilty without admitting the elements of the offense. In such a plea the defendant acknowledges the evidence strongly negates the defendant's claim of innocence and enters the plea to avoid a harsher sentence. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).)

The district court deferred judgment and placed the respondent on probation for five

years. As a condition of probation, the respondent was ordered to undergo treatment for alcoholism and follow this with an aftercare program. If the respondent successfully completes his probation, he of course will avoid a judgment of conviction. *See* Iowa Code § 907.3. One reason the district court gave for the sentence was the possibility that the respondent could avoid disbarment if he had no convictions.

At the time of the hearing on this disciplinary complaint, the respondent was a resident at a halfway house for recovering chemically dependent adult males in Sioux City. His license to practice law in Iowa was under temporary suspension. *See* Iowa Sup.Ct.R. 118.14.

## II. *Procedural Background.*

The Committee on Professional Ethics and Conduct filed a complaint with the Grievance Commission based on the respondent's actions of July 9, 1990. The complaint charged that the respondent's actions violated various disciplinary rules and an ethical consideration of the Iowa Code of Professional Responsibility for Lawyers.

The record made in the hearing before the commission included the complaint, the committee's request for admissions, the record from the criminal proceeding, witness testimony, and other evidence. The respondent answered affirmatively the request for admissions. He also testified in his own behalf.

After finding that the allegations of the complaint were proven, the commission recommended that the respondent's license to practice law be suspended for the term of his probation.

The respondent has not appealed from the commission's report. *See* Iowa Sup.Ct. R. 118.11. Our review is de novo. *See* Iowa Sup.Ct.R. 118.10. We independently determine the matter and take appropriate action on it. *Id.* We may impose a lesser or greater sanction than that recommended by the commission. *Id.*

Because our review is de novo, the commission's findings—while considered—are not binding on us. The allegations in the complaint must be proven by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Conzett,* 476 N.W.2d 43, 44 (Iowa 1991).

Our determination of appropriate discipline is guided by "the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the respondent's fitness to continue in the practice of law." *Committee on Professional Ethics & Conduct v. Blomker,* 379 N.W.2d 19, 20–21 (Iowa 1985).

## III. *Findings of the Commission.*

We agree with the commission that the evidence in this case meets the burden of proof for the violation of the disciplinary rules and the ethical consideration charged. These include DR 1–102(A)(1) (violating a disciplinary rule), DR 1–102(A)(3) (engaging in illegal conduct involving moral turpitude), DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), DR 1–102(A)(6) (engaging in conduct that adversely reflects on a lawyer's fitness to practice law), and EC 1–5 (failing to refrain from illegal conduct). This brings us to the question of appropriate discipline in these circumstances.

## IV. *Discipline.*

The posture of the criminal action against the respondent is somewhat unusual and bears upon the commission's recommendation. As we noted earlier, entry of judgment has been halted to await the successful completion of the respondent's five-year term of probation and the conditions incident to it. If he successfully completes probation, there will be no judgment of conviction entered against him regarding the weapons charges. This could allow the respondent the opportunity to practice law again should we acquiesce in the commission's recommendation.

The commission apparently was influenced by the procedural posture of the criminal case and the success the respondent has experienced so far in counseling. The record shows he has found stable nonlegal employment. He appears deter-

mined to turn his life around. In sum, the record indicates that, with continued therapy and aftercare, the respondent can again be a productive and successful citizen. Similar considerations have led us to refrain from the ultimate discipline—disbarment—in at least one case involving criminal conduct. *See Committee on Professional Ethics & Conduct v. Tompkins*, 415 N.W.2d 620, 624 (Iowa 1987).

However, we reach a point where the conduct complained of is so egregious that we feel compelled to disbar in spite of these efforts at rehabilitation. The facts in this case convince us that the respondent's conduct reached that point.

Our careful review of the record leads us to conclude—as the respondent admitted—that he harbored ill feelings and rage toward the five intended victims over a substantial period of time.

In a face-to-face discussion with Dale's prosecutor in 1989, the respondent told him, "If someone shot you, it would be justifiable homicide." This was in response to the prosecutor's comment that a prison term was the appropriate sentence for the respondent's wife. Further, the respondent admitted that he felt anger toward the district associate judge and Dale's two sisters for some time prior to July 9, 1990.

Regarding the events of July 9, 1990, the respondent admitted that alcohol did not cause the rage he felt that evening. Indeed, the rage was so strong that the respondent wanted to stay in jail after his arrest because he feared he might harm these people if he were free. In our view alcohol only potentiated the rage.

The evidence leads us to one inescapable conclusion: the respondent knew what he was doing when he armed himself. It is significant that he armed himself, not with one weapon, but with two and used, not ordinary ammunition, but ammunition having far more potential to kill and maim.

We believe the respondent understands the gravity of his past conduct. We believe he is honestly contrite for the resultant harm perpetrated upon the profession, his clients, his friends and family, and himself. Nevertheless, discipline less than disbarment would send the wrong message not only to the public but to the intended victims. Any discipline less than disbarment would trivialize the respondent's conduct and make light of the great danger these intended victims faced. Anyone capable of contemplating killing any human being, let alone five, has no place in our profession.

Consequently, we find that disbarment is the only appropriate disposition here.

Costs are assessed to the respondent under Iowa Supreme Court Rule 118.22.

LICENSE REVOKED.