The **COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,**

v.

**Dana Lynn BARRER, Respondent.**

**No. 92–1753.**

Supreme Court of Iowa.

Feb. 17, 1993.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Gerald W. Crawford, Des Moines, and J.D. Hartung, Des Moines, for respondent.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, LAVORATO and SNELL, JJ.

SNELL, Justice.

This is a lawyer discipline case involving moral turpitude. The committee brought charges against respondent Dana L. Barrer after he pleaded guilty to three charges of harassment in the third degree in violation of Iowa Code sections 708.7(1)(a) and 708.-7(4) (1991). Barrer's sentence of thirty days in jail on each count was suspended for one year while he was on probation undergoing treatment for alcoholism. The issue before us is not the question of guilt but the appropriateness of a sanction. The commission recommended a suspension of his license to practice law for one year but that it be stayed for a three-to-five-year period during which respondent would have to comply with several conditions of probation. We find that respondent's license should be suspended for a period of two years and so order.

Respondent is a twenty-nine-year-old lawyer who was admitted to practice law in 1988. He had a fine academic career in high school and in college, graduating with honors. In law school he finished first in his class after his freshman year but slipped to thirteenth his senior year.

Barrer's regression in academic achievement and problems in his career pursuits stem from excessive alcohol consumption that started in college. During his freshman year in college he drank a twelve-pack of beer a day. By his third year in law school he was consuming eighteen to twen-ty-four beers a day, every day. On weekends his consumption sometimes reached two-to-three cases a day. Barrer says that during these times he has little memory of what he was doing.

After graduating from law school, Barrer had a half-year of work unrelated to law and a half-year of inactivity except for consuming alcohol while trying to determine his future. He then obtained a job working for a state agency in Ottumwa. His excessive drinking continued.

While living in Ottumwa, Barrer began making obscene telephone calls to young men of high school age. He was charged and pleaded guilty to three charges of harassment, all simple misdemeanors. As part of the probation terms on the criminal convictions he underwent psychological evaluation and entered treatment for alcoholism.

The committee charged Barrer with unprofessional conduct that violated EC 1–5 and DR 1–102(A)(3) and 1–102(A)(6).

EC 1–5 states:

A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise. He should be temperate and dignified, and he should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

DR 1–102(A)(3) states: "A lawyer shall not engage in illegal conduct involving moral turpitude."

DR 1–102(A)(6) states: "Misconduct. A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law."

The allegations charged by the committee were admitted by Barrer and the commission found that he violated the stated ethical and disciplinary rules. On a vote of four-to-one, the commission recommended

to stay a one-year suspension of Barrer's license to practice law and place respondent on probation. The dissenting member recommended to suspend the license to practice law for eighteen months without probation.

The probation terms recommended by the commission were that Barrer must (a) continue to participate in Alcoholics Anonymous meetings and attend at least three meetings each week, (b) maintain regular contact with a member of the Lawyers Helping Lawyers Committee of the Iowa State Bar Association, (c) voluntarily report any personal use of alcohol or illicit drugs, (d) voluntarily report any violation of law which he may commit, (e) subject himself to random, unannounced blood and/or urine tests to determine whether alcohol or illicit drugs have been consumed by him during the period of probation, and (f) personally pay all costs of said probation including supervision and medical testing.

We are reviewing the decision of the grievance commission as prescribed by rule 15 of the Grievance Commission Rules. Our review of the proceedings is de novo. *Committee on Professional Ethics & Conduct v. Munger*, 375 N.W.2d 248, 250 (Iowa 1985). The findings and recommendations of the grievance commission are not binding, but we accord them respectful consideration. *Committee on Professional Ethics & Conduct v. Rabe*, 284 N.W.2d 234, 235 (Iowa 1979). We may impose a lesser or greater sanction than the discipline recommended by the grievance commission. Iowa Sup.Ct.R. 118.10.

Barrer attributes his behavior that led to his guilty pleas to his alcoholism. This problem was exacerbated by the stress of handling an enormous case load in his office. He states that he now realizes his condition, though he should have earlier, and has taken steps to correct it. He has maintained sobriety for ten months which he intends to continue indefinitely. In the course of treatment he acknowledged suffering from repressed homosexuality. This condition, combined with his alcoholic state, resulted in the acts of harassment. He recognizes these acts as wrong, but he has little memory of them.

Expert testimony was presented by Dr. Stanley M. Haugland, medical director of Powell Chemical Dependency Center at Iowa Methodist Hospital in Des Moines. During his eighteen years as medical director, the hospital has treated over 17,000 patients for alcoholism. Dr. Haugland cited studies and gave his opinion that alcoholism is a disease which robs a person of the willpower to resist psychoactive drugs such as alcohol. Dr. Haugland interviewed Dana Barrer and studied the physical and psychological tests given to him. He testified that Barrer has a favorable prognosis for maintaining sobriety. His participation in AA was a favorable sign and his having professional skills would promote recovery. He believed that the sexual dysfunction arising from homosexuality would not reoccur if sobriety is maintained.

Dr. Haugland was asked whether Barrer was capable of forming a specific improper or unlawful intent in making harassing telephone calls while intoxicated. He stated: "It's hard to say. It depends on, I think, in large measure how much a person drinks." The amount of alcohol drunk each day by Barrer would "grossly impair, heavily impair judgment. You're out of your mind when you're under the influence that much."

On the question of a repeat of the criminal conduct Dr. Haugland recognized the possibility but thought the likelihood was rare. He stated that in the vast majority of cases where recovery is maintained afterwards, a repeat of bad conduct is not manifested.

Respondent argues for a sanction based on the probation condition outlined by the commission.

The committee resists the stay of any suspension and the placing of respondent on probation. The effect would be the same, argues the committee, as a public reprimand coupled with probation. The practice of law would not be curtailed and the seriousness of the ethical violations would be left unaddressed.

We have consistently refused to recognize a lawyer's personal or emotional problems as a defense to charges of unethical conduct. *See Committee on Professional Ethics & Conduct v. Wenger,* 469 N.W.2d 678, 681 (Iowa 1991); *Committee on Professional Ethics & Conduct v. Robinson,* 458 N.W.2d 393, 394 (Iowa 1990); *Committee on Professional Ethics & Conduct v. Hoffman,* 402 N.W.2d 449, 451 (Iowa 1987). This includes the stress and inner turmoil of attempting to cope with a homosexual identity. *See Committee on Professional Ethics & Conduct v. Lindaman,* 449 N.W.2d 341, 342 (Iowa 1989) ("we reject Lindaman's suggestion that his inability to deal with his homosexuality somehow excuses the criminal behavior that has led to these disciplinary proceedings").

> Nearly every lawyer involved in these cases could cite personal problems as the cause of the professional downfall. But life in general is a series of problems and it is the fundamental purpose of our profession to face and solve them. Our profession certainly cannot excuse misconduct on the basis of personal problems.

*Committee on Professional Ethics & Conduct v. Cook,* 409 N.W.2d 469, 470 (Iowa 1987).

Moreover, criminal law defenses do not apply in lawyer disciplinary proceedings. *See Committee on Professional Ethics & Conduct v. Vesole,* 400 N.W.2d 591, 592 (Iowa 1987) (defense of irresistible impulse unavailable); *Committee on Professional Ethics & Conduct v. Silver,* 395 N.W.2d 877, 878–79 (Iowa 1986) (criminal law defenses such as insanity and diminished responsibility cannot be considered). Alcoholism and intoxication are not excuses for ethical misconduct. *See Committee on Professional Ethics & Conduct v. Williams,* 473 N.W.2d 203, 206 (Iowa 1991); *Committee on Professional Ethics & Conduct v. Jackson,* 284 N.W.2d 234, 236 (Iowa 1979); *Rabe,* 284 N.W.2d at 236.

It is clear that a misdemeanor involving moral turpitude is grounds for revocation or suspension of license. *See* Iowa Sup. Ct.R. 118.10; *Committee on Professional Ethics & Conduct v. Floy,* 334 N.W.2d 739, 740 (Iowa 1983).

Respondent's desire and efforts made toward rehabilitation are commendable. To focus exclusively on that, however, ignores the nature and depth of the offenses committed by Barrer. Though he professes little memory of them, he admits that what he did was shocking and appalling. Barrer made multiple nightly phone calls to teen-aged boys over a period of several weeks. His entreaties to engage in homosexual relations with him were bluntly stated in graphically disgusting language. The words used left nothing to the imagination and were aggressively repeated in consecutive calls at five minute intervals. Often he would continue making calls until 2:00 a.m. or later in the morning. He had ignored repeated requests from the young men and their parents to stop. The victims were at once repelled, angry and afraid. One of the boys stated that the call-waiting feature of the phone kept beeping, and he was barely able to talk to his friends due to the uncontrollable shaking. An indication that Barrer was aware of his harmful activity comes from the fact that he never disclosed his true identity in the calls. He referred to himself as "Mike."

Continued boldness reached the point where "Mike" invited a boy to his residence which would be identifiable by blinking lights on the porch. On investigation, the house was located as described which resulted then in Barrer's ultimate arrest.

Barrer points out that he never actually had physical contact with the boys and did not intend to. We need not speculate on whether Barrer would have carried out his homosexual desires because we view his persistent and flagrant actions, without more, as serious displays of moral turpitude.

He calls attention to the struggle he had over whether to contest the committee's charges or just quietly forfeit his license to practice law, leaving to others the presentation of issues involving alcoholism. Of course, the committee became involved only after Barrer's arrest and conviction

which were matters of public record. We neither criticize Barrer nor find merit in his rising to challenge the committee's charges.

Barrer argues that his conduct was of a nonviolent type unlike that in *Committee on Professional Ethics & Conduct v. Sturgeon*, 487 N.W.2d 338 (Iowa 1992), in which the lawyer prepared to shoot five people, or in *Committee on Professional Ethics & Conduct v. Tompkins*, 415 N.W.2d 620 (Iowa 1987), in which the lawyer broke into homes to steal undergarments. Although we agree the illegal activity had not advanced as far as in the cited cases, it nevertheless inflicted considerable fear, pain, and distress on his victims. By comparison, this conduct was more egregious than in *Floy*, 334 N.W.2d at 740, where we ordered a license suspension of eighteen months based on two obscene phone calls.

Barrer argues that because he is afflicted with the disease of alcoholism which he says blocks any intent to commit the unlawful acts he actually committed, probation is the appropriate sanction. While intent is the critical element in much of the criminal law, in ethics cases, though an important factor, it is not the overriding concern. Lawyers are rightly held to a high degree of public scrutiny and their conduct must meet with the general approval of the public. Appearances, as well as intentional acts, can be as destructive to the standards of the law profession. With this in mind, we are convinced that it matters little whether alcoholism is a disease. In an ethics case of this sort, the effect is more important than the cause.

Due to the seriousness of the ethical violations inherent in Barrer's acts, both as to their effect and their implications, this is not a case for probation. Rarely has probation been employed by our court. *See, e.g., Committee on Professional Ethics & Conduct v. Mahoney*, 402 N.W.2d 434, 435 (Iowa 1987) (supervision by law partner); *see also In re Scannell*, 289 Or. 699, 703, 617 P.2d 256, 258 (1980) ("We have not often found 'probation' to be a practical disciplinary sanction, because neither the court nor the bar has effective machinery for supervising stringent conditions, and without conditions and supervision 'probation' is largely meaningless.").

The suggestion that the Iowa State Bar Association Lawyers Helping Lawyers Committee could serve as a supervising agency places that group beyond its scope. That committee performs a commendable service, intervening in cases of substance abuse to encourage impaired attorneys to obtain treatment. Its members are practicing attorneys and judges whose activity is ameliorative, rather than of the supervisory nature of a probation authority.

Our conclusion is that suspension is warranted. We suspend Barrer's license to practice law indefinitely with no possibility of reinstatement for two years from the date of this opinion. Any application for reinstatement shall be accompanied by satisfactory evidence that respondent is not suffering from any physical or mental impairment that would interfere with his competent handling of legal business entrusted to him. Costs are taxed to respondent pursuant to Iowa Supreme Court Rule 118.-22.

LICENSE SUSPENDED.