# IN THE SUPREME COURT OF IOWA

No. 14–1708

Filed March 6, 2015

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

   Complainant,

vs.

**GERALD ANTHONY LYMAN MOOTHART,**

   Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

The grievance commission reports the respondent committed multiple ethical violations and recommends a thirty-month suspension of the attorney's license. **LICENSE SUSPENDED.**

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for complainant.

Christopher A. Clausen of Moothart & Clausen Law Office, Ames, for respondent.

**APPEL, Justice.**

The Iowa Supreme Court Disciplinary Board charged attorney Gerald A.L. Moothart with multiple violations of our disciplinary rules in connection with interactions and relationships with five women between 2006 and 2011. These charges include allegations of sexual harassment in the practice of law with each of the five women, sexual relations with a client with two of the women, and an allegation of a concurrent conflict of interest arising as a result of his relationship with one woman.

After a hearing, a division of the Grievance Commission of the Supreme Court of Iowa concluded that Moothart committed each of the alleged violations and recommended a thirty-month suspension. Additionally, the commission recommended that prior to reinstatement, Moothart provide proof of participation in a psychological evaluation and counseling, or other form of treatment, which would provide some indication that he is fit to practice law.

Upon de novo review of the record and the commission's findings of fact, conclusions of law, and recommendations, we agree Moothart committed all the violations found by the commission. Giving particular consideration to the vulnerability of each woman with whom Moothart interacted, we also agree with the commission's recommended sanction and order Moothart's license suspended for thirty months. Additionally, before he is reinstated, we require Moothart to provide this court with an evaluation by a licensed health care professional, including proof of participation in a counseling program specific to sexual harassment, verifying his fitness to practice law.

## I. Background Facts and Proceedings.

Respondent Moothart is a licensed Iowa attorney. He graduated from law school in May 1996, passed the Iowa bar examination, and was admitted to practice the following month.

After obtaining his law license, Moothart worked as an assistant county attorney for the Marshall County attorney's office for about one and one-half years. Thereafter, he began working in private practice in Ames, Iowa, where he continues to practice today. He practices primarily in criminal defense and family law. From March 2003 until December 2013, Moothart was a sole practitioner. In December 2013, an associate attorney joined the firm.

Moothart generally has a reputation in the Ames area as a very good defense and family-law attorney. He has developed forms and methods of practice that are used by other attorneys and has been a mentor to new attorneys. He has served as president and as a member of the board of directors of the Center for Creative Justice in Ames.

On March 18, 2011, the State charged Moothart in Story County with assault with intent to commit sexual abuse on Jane Doe #1[1] in violation of section 709.11 of the Iowa Code. Three days after being charged, Moothart filed a report with the Office of Professional Regulation, which included a copy of the complaint.

Following a trial in June of 2011, Moothart was acquitted of the criminal charge. After the filing of the criminal charge against Moothart, Jane Does #2, #3, #4, and #5 filed complaints with the Ames police department and later filed complaints with the Iowa Supreme Court

---

[1]Due to the nature of the complaints and the accompanying factual backgrounds involved in this case, we use the pseudonym "Jane Doe" to identify each woman involved in the proceedings against Moothart.

Attorney Disciplinary Board. All of these complaints alleged that Moothart engaged in various acts of sexual misconduct.

On December 31, 2013, the Board filed a five-count complaint against Moothart. The complaint alleged Moothart engaged in sexual harassment in the practice of law with each of the five women in violation of Iowa Rule of Professional Conduct 32:8.4(g). In addition, for Jane Doe #2 and Jane Doe #3, the Board alleged Moothart engaged in sexual relations with a client, in violation of Iowa Rule of Professional Conduct 32:1.8(j). Lastly, with respect to Jane Doe #2, the Board additionally alleged a conflict of interest in violation of Iowa Rule of Professional Conduct 32:1.7(a)(2).

The commission held a hearing on May 14 and 15, 2014. All five Jane Doe's testified, as did Moothart, Jane Doe #1's father, Jane Doe #3's caseworker, and attorney Daniel Gonnerman, a character witness for Moothart.

The commission found that Moothart had committed all the violations as charged by the Board. In making its findings and conclusions, the commission generally credited the testimony of the complaining witnesses and not that of Moothart. On legal issues, the commission noted that violation of Iowa Rule of Professional Conduct 32:8.4(g), relating to sexual harassment, did not require an attorney–client relationship, but only that the conduct occur "in the practice of law." The commission also concluded the term "sexual harassment" in the rule is broadly construed and consent is not a defense in the context of an attorney–client relationship. Based on the vulnerability of the complainants, the pervasiveness of the misconduct, and the balance of aggravating and mitigating factors, the commission recommended that Moothart's license be suspended for thirty months. The commission also

recommended that prior to reinstatement, Moothart present proof that he has obtained a psychological evaluation and counseling and that he was fit to practice law.

## II. Standard of Review.

We review factual findings of the commission de novo. Iowa Ct. R. 35.11(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 101 (Iowa 2012). We give respectful consideration to the findings of the commission, especially when considering credibility of witnesses, but are not bound by them. *Van Ginkel*, 809 N.W.2d at 101; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 759 (Iowa 2010). The Board must prove charges by a convincing preponderance of the evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans*, 537 N.W.2d 783, 784 (Iowa 1995). "This burden is higher than the burden in most civil cases, but lower than in a criminal prosecution." *Van Ginkel*, 809 N.W.2d at 102. It is also less stringent than the clear and convincing evidence which is the highest standard of civil proof. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996) (per curiam).

## III. Legal Issues.

**A. Introduction.** Before we review the evidence developed at the hearing and consider the appropriate sanction, if any, we first address several important legal issues that will impact our approach to our de novo review of the record. We will review the nature of the burden of proof in this case; the scope of the phrase "sexual harassment . . . in the practice of law" under Iowa Rule of Professional Conduct 32:8.4(g); the proper approach to establishing the existence of an attorney–client relationship under rule 32:1.8(j), which prohibits sexual relations with a client; the applicability of rule 32:1.7(a)(2) prohibiting concurrent

conflicts of interest when a conflict arises between one client and another person who is not a client; and two rules of evidence that are applicable to this disciplinary proceeding.

**B.  Burden of Proof.**  In this case, as in all disciplinary cases, we note the Board bears the burden of proof of showing a violation of our disciplinary rules by a convincing preponderance of the evidence.  *See, e.g., Evans*, 537 N.W.2d at 784.  We note it is one thing to make allegations or claims and another to provide evidence to meet the somewhat heightened burden of proof in an attorney disciplinary case.  While we recognize that we live in an age in which there is often a rush to judgment on controversial questions, episodes such as the McMartin child abuse case and the Duke Lacrosse debacle show the fallacy of assuming guilt when sexual misconduct is alleged.  On the other hand, we refuse to cast our eyes aside because of the uncomfortable nature of the allegations in cases concerning charges of sexual misconduct involving lawyers.  It is our duty in this case, as it is in every case, to carefully sift through the evidence, examine it with a critical eye, and reach a fair and impartial result.  We base our judgment solely on the facts of the case and the applicable law.

**C.  Scope of "Sexual Harassment . . . in the Practice of Law" Under Rule 32:8.4(g).**  Iowa Rule of Professional Conduct 32:8.4(g) provides: "It is professional misconduct for a lawyer to . . . engage in sexual harassment . . . in the practice of law . . . ."  This case presents several legal questions regarding the scope and meaning of the phrase "sexual harassment . . . in the practice of law" as used in the rule.

We first note that the rule utilizes the comparatively broad phrase "in the practice of law."  We have noted that this language is "quite broad."  *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588

N.W.2d 121, 124 (Iowa 1999). We think the language makes it clear that the rule may be violated even if there is no attorney–client relationship between the lawyer and the person subject to sexual harassment, as long as the attorney is engaged in the practice of law. The rule may be violated if a lawyer sexually harasses witnesses, court personnel, law partners, law-office employees, or other third parties that come into contact with a lawyer engaged in the practice of law. *See id.* Cases from other jurisdictions prior to Iowa's adoption of rule 32:8.4(g) have for some time held that sexual harassment against non-clients violated more general ethical rules. *See, e.g., People v. Lowery*, 894 P.2d 758, 760 (Colo. 1995) (en banc) (sexual harassment of employees); *In re Discipline of Peters*, 428 N.W.2d 375, 376, 381–82 (Minn. 1988) (sexual harassment of employees and law students); *In re Gould*, 4 A.D.2d 174, 176 (N.Y. App. Div. 1957) (per curiam) (sexual harassment of job applicants). Clearly, the adoption of rule 32:8.4(g), which explicitly prohibits sexual harassment in the practice of law, was designed to strengthen, and not limit, the application of ethical rules in the sexual harassment context. *See Steffes*, 588 N.W.2d at 124.

Second, we consider what is meant by the term "sexual harassment." In briefing before the commission, Moothart offers a narrow definition of sexual harassment borrowed largely from employment law. Citing Equal Employment Opportunity Commission guidelines, 29 C.F.R. § 1604.11 (1980), Moothart asserts that sexual harassment must be unwelcome and must be more than an occasional stray comment. The Board counters that Moothart's definition of sexual harassment is too narrow and out of context. According to the Board, our cases indicate sexual harassment can include any physical or verbal act of a sexual nature that has no legitimate place in a legal setting. *See*

*Steffes*, 588 N.W.2d at 124 (noting that rule regarding sexual harassment was adopted in response to recommendation made by the Equality in the Courts Task Force, which examined "discriminatory treatment received by women in the courtroom and from the legal system in general" (citing Equality in the Cts. Task Force, State of Iowa, *Final Report* 41–92 (1993))). The commission agreed with the Board's approach. So do we.

In *Steffes*, we emphasized the breadth of the term "sexual harassment" used in rule 32:8.4(g). *Id.* We stated sexual harassment as used in the rule includes " 'sexual advances, requests for sexual favors, and other verbal [or] physical conduct of a sexual nature.' " *Id.* (quoting Black's Law Dictionary 1375 (6th ed. 1990)). We have not required that the harassment be ongoing or pervasive as has been required in some employment contexts. *See, e.g.*, *id.* at 124–25 (deeming sexually revealing photos allegedly documenting back injury conduct of a sexual nature, thereby constituting sexual harassment).

Third, we have generally rejected the notion that consent is a defense to acts of sexual harassment, at least in the context of an attorney–client relationship. For instance in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Hill* (*Hill II*), we noted in the context of sexual harassment that "the professional relationship renders it *impossible* for the vulnerable layperson to be considered 'consenting.' " 540 N.W.2d 43, 44 (Iowa 1995) (emphasis added). In short, Iowa has adopted a per se rule regarding sexual harassment of a client. *See id.* at 43–44; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 703–04 (Iowa 2006).

**D. Establishing an "Attorney–Client Relationship" Under Rule 32:1.8(j) Prohibiting Sexual Relations with a Client.** Iowa Rule of Professional Conduct 32:1.8(j) provides in relevant part: "A lawyer shall

not have sexual relations with a client . . . unless the person is the spouse of the lawyer or the sexual relationship predates the initiation of the client–lawyer relationship."

Unlike rule 32:8.4(g) related to sexual harassment, our rule prohibiting sexual relations requires the existence of an attorney–client relationship. *Compare id.* r. 32:1.8(j), *with id.* r. 32:8.4(g). When an attorney–client relationship is present, however, a per se rule applies to clients who are not spouses or when a sexual relationship does not predate the attorney–client relationship. As with sexual harassment, consent is not a defense. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Furlong*, 625 N.W.2d 711, 714 (Iowa 2001).

In determining whether an attorney–client relationship is present, a comment to our rules notes that "principles of substantive law external to [the ethical rules] determine whether a client-lawyer relationship exists." Iowa R. Prof'l Conduct Scope [17]. In *Iowa Supreme Court Attorney Disciplinary Board v. Netti*, "consistent with section 14 of the Restatement (Third) of the Law Governing Lawyers," we noted a three-part test determines the existence of an attorney–client relationship. 797 N.W.2d 591, 599 (Iowa 2011). Such a relationship exists when:

> (1) a person sought advice or assistance from an attorney, (2) the advice or assistance sought pertained to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agreed to give or actually gave the desired advice or assistance.

*Id.* (quoting *Comm. on Prof'l Ethics & Conduct v. Wunschel*, 461 N.W.2d 840, 845 (Iowa 1990)); *see also* Restatement (Third) of the Law Governing Lawyers § 14, at 125 (2000). Therefore, determining when an attorney–client relationship begins is a question of fact. *Cf. Wunschel*, 461 N.W.2d at 845; *Kurtenbach v. TeKippe*, 260 N.W.2d 53, 57 (Iowa 1977).

For example, in determining the existence of an attorney–client relationship, we have addressed situations involving persons who might be considered former clients. For instance, in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Walters*, we considered a case in which a lawyer borrowed money from a former client. 603 N.W.2d 772, 774–75 (Iowa 1999). The applicable disciplinary rule prohibited a business transaction with a client under certain situations. *Id.* at 775. We held that the rule applied "as long as the attorney has influence arising from a previous attorney-client relationship and the client is looking to the attorney to protect the client's interest." *Id.* at 775; *see also Manoir–ElectroAlloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 194 (D.N.J. 1989) (holding client reasonably viewed law firm as continuing representation in light of follow-up letters related to prior work); *Disciplinary Counsel v. Bunstein*, 995 N.E.2d 184, 187 (Ohio 2013) (per curiam) (finding lawyer–client relationship when lawyer had previously represented client involving same issue and when client reasonably sought attorney's advice); *In re Conduct of Hassenstab*, 934 P.2d 1110, 1114 (Or. 1997) (noting "[a] lawyer need not be on retainer or engaged for a specific purpose to be considered an attorney for a client who, from time to time, calls that lawyer seeking legal advice" (alteration in original) (internal quotation marks omitted)).

**E. Conflict of Interest Involving Nonparties.** Rule 32:1.7 provides in relevant part:

> (a) . . . [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> . . . .
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's

responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

Iowa R. Prof'l Conduct 32:1.7(a)(2).

For purposes of this case, it is important to observe that a concurrent conflict of interest may arise even though there is only one attorney–client relationship. When representing a client, the ABA long ago emphasized that "[p]rotecting a client's emotional and physical well-being is surely as important as protecting the client's financial well-being." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 92-364 (1992). We agree.

A number of courts have found violations under conflict rules similar to rule 32:1.7(a)(2) when a lawyer engaged in sexual misconduct toward a client. For instance, in *In re Disciplinary Proceedings Against Ridgeway*, the Wisconsin Supreme Court found a lawyer violated its concurrent-conflicts rule when he provided beer to his client contrary to the conditions of the client's probation and had sexual contact with her at the same time he was representing her on a possible probation revocation matter. 462 N.W.2d 671, 671–73 (Wis. 1990). Similarly, in *People v. Bauder*, the Colorado Supreme Court considered a case in which an attorney sexually solicited the wife of a dissolution client. 941 P.2d 282, 282–83 (Colo. 1997) (en banc) (per curiam). The Colorado court concluded that "while the women involved were not themselves clients of the respondent, the respondent's comments and proposals violated the fiduciary duty that the respondent owed his client because of the victims' relationships to the client." *Id.* at 283. Other jurisdictions have found similar violations. *See, e.g., In re Piatt*, 951 P.2d 889, 891 (Ariz. 1997) (en banc) (holding sexual harassment of client by lawyer violated rule prohibiting lawyer from representing client when that

representation was materially limited by lawyer's own interests); *Attorney Grievance Comm. of Md. v. Culver*, 849 A.2d 423, 435 (Md. 2004) (holding attorney who had sex with client placed his personal interest above those of client who was in unstable emotional state due to pending divorce); *In re Application for Disciplinary Action Against Chinquist*, 714 N.W.2d 469, 473–75 (N.D. 2006) (finding conflict of interest when lawyer engaged in sexual relationship with client while working on visitation and child-support issues); Chesley Payne, *An Overview of Sexual Harassment in the Attorney-Client Relationship as Interpreted Under the ABA Rules of Professional Conduct*, 26 J. Legal Prof. 249, 251 (2002) (noting concurrent-conflict rule is an often cited rule "that squarely fits the situation of sexual harassment in the attorney-client relationship").

**F. Evidentiary Issues Implicated in this Case.** The Iowa Rules of Evidence apply in disciplinary proceedings. *See* Iowa Ct. R. 36.14(3). Our review of the record in this case reveals two evidentiary issues, namely, the use of prior acts of the respondent as evidence of subsequent acts, and the use of prior consistent statements to buttress the credibility of the complainants' testimony.

We begin with a discussion of the issue of use of prior acts as evidence of subsequent acts. Iowa Rule of Evidence 5.404(*b*) generally limits admissibility of proof "of other crimes, wrongs, or acts" in order "to prove the character of a person in order to show that the person acted in conformity" with that character at another time. The rule, however, explicitly allows admission of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Under the rule as interpreted by our caselaw, prior bad acts are not admissible to show general propensity of wrongdoing but may be admissible to show

signature crimes, relationship of the parties, or other nonpropensity facts. *See State v. Putman*, 848 N.W.2d 1, 10–13 (Iowa 2014) (canvassing authorities and distinguishing between cases merely with common threads and cases with striking similarities and admitting evidence as relevant to identity of perpetrator); *State v. Cox*, 781 N.W.2d 757, 760–61 (Iowa 2010) (holding prior acts of sexual abuse not admissible when not relevant to any nonpropensity purpose such as opportunity, common scheme or plan, or modus operandi).

In this case, five separate charges were brought against Moothart. Moothart did not seek to sever the charges, however, and did not seek to limit the use of prior-bad-acts testimony. In any event, the evidence related to each complainant was plainly admissible to show alleged violations against them.

In at least one prior case, we declined to consider the application of rule 5.404(*b*) in the context of multiple charges of sexual misconduct. *See, e.g., McGrath*, 713 N.W.2d at 687 n.1; *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005) (declining to decide whether admission of prior-acts evidence was harmless error and refraining from considering prior-acts evidence in de novo review). In our de novo review, we recognize the general proposition embraced by the rule, namely, that absent some relevance other than propensity, evidence related to sexual harassment of one person should be given no weight in determining the merits of a different sexual harassment claim involving another person.

A second issue relates to the use of prior consistent statements. Under Iowa Rule of Evidence 5.801(*d*)(1)(B), a prior consistent statement is admissible if the declarant is available for cross-examination at the hearing and if the prior consistent statement is offered to rebut the opposing party's express or implied charge of recent fabrication or

improper influence or motive. Thus, to the extent Moothart challenged the credibility of witness testimony, prior consistent statements of the same witness are admissible to rebut the opposing party's charge of improper motive.

**IV. Discussion of Merits.**

**A. Jane Doe #1 (Sexual Harassment).** The Board charged Moothart with sexual harassment of Jane Doe #1 in violation of rule 32:8.4(g). Based on our de novo review of the entire record, and giving due consideration to the credibility determinations of the commission, we find the following facts.

Jane Doe #1 was a twenty-two-year-old college student who was arrested and charged with operating while intoxicated (OWI), first offense in August 2010. With Moothart as her lawyer, Jane Doe #1 pled guilty, received a deferred judgment, and was put on probation. During attorney–client meetings with Jane Doe #1 in Moothart's office, Moothart made explicit and crude sexual comments about her body that made Jane Doe #1 feel "really uncomfortable."

Ultimately, Jane Doe #1 left school for a period of time, but when she returned to school several months later, she contacted Moothart. Although Moothart had sent Jane Doe #1 a letter after her sentencing advising Jane Doe #1 that his representation had terminated, Moothart instructed her to contact him upon her return to school so that he could write a letter advocating her early discharge from probation. In addition, Moothart later sent Jane Doe #1 a letter in early December with a copy of her probation contract signed the previous month in which Jane Doe #1 declared that Moothart was her attorney. This letter told Jane Doe #1 that she should contact Moothart if she had any questions.

Upon her return to college, Jane Doe #1 telephoned Moothart as instructed and a meeting was scheduled for January 20, 2011. At the subsequent meeting, Jane Doe #1 and Moothart sat in a conference room at his office after hours and discussed matters related to her successful completion of the terms of her probation for about forty-five minutes. After this part of the evening concluded, Moothart mixed and served her three or four vodka lemonade drinks and she became intoxicated. Moothart did not consume alcohol, but drank soda.

As the evening progressed, the discussion changed to topics of a sexual nature. At some point, Moothart asked Jane Doe #1 to come around to his side of the table and show him her breasts. Although exactly how this occurred is somewhat disputed, it is undisputed that following Moothart's request, Jane Doe #1's breasts were fully exposed to Moothart. Jane Doe #1 was "extremely uncomfortable" when Moothart looked at her breasts. Shortly thereafter Moothart and Jane Doe #1 moved to a dark room where there was a couch. They sat on the couch in a sexually provocative manner. Moothart then made sexual suggestions to Jane Doe #1. At that point, Jane Doe #1 asked to be driven home and Moothart drove Jane Doe #1 back to her apartment, dropping her off at approximately 9:30 p.m.

Jane Doe #1's father became aware something unusual had happened that night after Jane Doe #1 called home after meeting with Moothart in an intoxicated state, talked mostly to her mother, and provided the outlines of the sexual encounter. Concerned about his daughter's welfare, Jane Doe #1's father called Moothart's law office that evening at about 10:30 p.m. and left a message with Moothart. When Jane Doe #1's father eventually spoke with Moothart after a few days,

Moothart told him that the purpose of the meeting with his daughter was to discuss her probation.

Moothart admitted to many, though not all, of the facts recited by Jane Doe #1, including that he provided alcohol to her that night, that she exposed her breasts, that they sat together on the couch in sexually suggestive positions, and that he took Jane Doe #1 home at that point. He recognized that serving alcohol to someone on probation for an alcohol offense was "the dumbest thing anybody could do, especially an attorney." He further testified the evening was not appropriate for a married man with a daughter, stating, "There was nothing right about that night."

Moothart disputed, however, that he and Jane Doe #1 had an attorney–client relationship during the encounter. Therefore, the fighting issue was whether Jane Doe #1 was a client at the time the above events transpired. On the question of Moothart's relationship with Jane Doe #1 on January 20, we recognize that Moothart sent her a letter in October 2010 indicating his representation had concluded. However, we note that his December letter to Jane Doe #1 included a probation contract signed by Jane Doe #1 in November listing Moothart as her attorney. Moothart was aware of this document as he forwarded it to Jane Doe #1. Further, Jane Doe #1 called Moothart at his professional office while still on probation to schedule an appointment which ultimately occurred at the office, although after hours. Finally, when Jane Doe #1's father talked to Moothart on January 24, 2011, Moothart claimed the meeting was professional in nature.

Under the facts as we view them, we think the Board established by a convincing preponderance of the evidence that an attorney–client relationship existed on January 20 under the standards of *Netti*, 797

N.W.2d at 599. Further, we think the facts fit comfortably within the approach recognized in *Walters*, in which we noted an attorney–client relationship existed with a former client "as long as the attorney has influence arising from a previous attorney–client relationship and the client is looking to the attorney to protect the client's interest." 603 N.W.2d at 775.

We also conclude the acts described above are sufficient to establish sexual harassment under our broad construction of the term. *See Steffes*, 588 N.W.2d at 124. Moothart does not escape culpability under our reading of sexual harassment under rule 32:8.4(g) simply because (he claims) Jane Doe #2 was intoxicated and did not expressly object to the activities or the sexual nature of their conversation. *See Steffes*, 588 N.W.2d at 125 (noting client's failure to actively resist attorney's inappropriate requests does not change ethical violation); *Hill II*, 540 N.W.2d at 44 (noting a vulnerable layperson cannot consent to sexual advances made by her attorney).

Based on our de novo review, we conclude the Board has established by a convincing preponderance of the evidence that Moothart violated rule 32:8.4(g) by engaging in sexual harassment in his office on January 20.

**B. Jane Doe #2 (Sexual Harassment, Sexual Relations with a Client, and Conflict of Interest).** The Board charged Moothart with sexual harassment, sexual relations with a client, and conflict of interest contrary to rules 32:8.4(g), 32:1.8(j), and 32:1.7(a)(2) regarding his interactions with Jane Doe #2. Based on our de novo review of the entire record, we find the following facts.

In the spring of 2010, Moothart was appointed to represent D.A. for a probation violation as a result of D.A. being charged with domestic

assault. Jane Doe #2 was the victim and primary witness of the domestic assault.

Prior to D.A.'s probation revocation hearing, Jane Doe #2 met twice with Moothart. During the first meeting in Moothart's office, Moothart complemented Jane Doe #2 on her physical appearance, with a specific comment about her breasts, which he asked to see. Jane Doe #2 also discussed her relationship with D.A. with Moothart, telling him D.A. was abusive towards her.

Also during the first meeting, Jane Doe #2 told Moothart she did not have a driver's license. Moothart responded that he could help her with that. Additionally, Moothart advised her to stay in a hotel to avoid receiving a subpoena. Jane Doe #2 did so based on his request.

On the day of D.A.'s probation revocation hearing, Moothart met with Jane Doe #2 alone in a conference room at the courthouse. At this second meeting, Moothart started kissing her "and stuff" while they were alone together. Jane Doe #2 did not object because she "was going to do anything to help [D.A.]." She stated, "I really didn't want to do it but I did it so [Moothart] would do his best to get my boyfriend out."

About a month later, Jane Doe #2 received a letter from Moothart, stating in pertinent part:

> Thank you for speaking with me earlier today, Ref: (a) I am writing to confirm I will take no further action regarding the status of your motor vehicle operator's license pending your formal request and agreement regarding the same.
>
> In anticipation of you making such request, however, attached please find a copy of the documents you will be executing when you come to my office, Enc (1) and (2). To expedite our meeting, please fill out Part B of the attached Request prior to our meeting. Kindly note you will also need to bring the following items with you to our meeting:
>
> - Check in the amount of $5.50 payable to *Treasurer, State of Iowa* (to include with the application)

- Driver's license or more likely, non-driver identification card

The letter also included an "Affidavit of Consent," which identified Moothart as Jane Doe #2's attorney. Following receipt of this letter, Jane Doe #2 provided Moothart with the $5.50 and a copy of her nondriver identification card.

A few weeks after Jane Doe #2 received the letter, Moothart picked her up and they traveled together to a hotel outside of Ames. The same day, Jane Doe #2 had her signature notarized on the Affidavit of Consent and gave it to Moothart when they met. Prior to picking Jane Doe #2 up, he had called and asked her what she preferred to drink, to which she responded wine. At the hotel, Jane Doe #2 drank an entire bottle of wine. Moothart drank no alcohol. Thereafter, Moothart and Jane Doe #2 had sex. Moothart paid for the hotel room. Following this night, Moothart and Jane Doe #2 had several phone conversations, which included conversations about her driver's license.

Two months after the first hotel tryst, Jane Doe #2 and Moothart met at another hotel outside of Ames. They discussed her driver's license and the steps Moothart was taking in resolving the matter. Moothart brought beer for Jane Doe #2 to drink and they had sex. Moothart again paid for the hotel room.

Following that night, Moothart wrote to Jane Doe #2 on office letterhead requesting that she sign the Affidavit of Consent in front of a notary. This letter also confirmed receipt of the $5.50 requested by Moothart. The following week, a document in Moothart's file, entitled "Privacy Act Agreement for Request of Motor Vehicle Records," identified him as Jane Doe #2's attorney.

Moothart admits he and Jane Doe #2 had sex on the two occasions described above. Moothart insists, however, that Jane Doe #2 was not

his client. Moothart testified he and Jane Doe #2 spoke only about matters related to D.A.'s probation revocation hearing during his meetings with Jane Doe #2 prior to the hearing. He claimed the later sexual liaisons were consensual in nature.

With respect to the documents in his file on Jane Doe #2, Moothart claims the letters were fake and designed to assuage D.A., a person with a propensity toward violence. Moothart testified the letters and discussions about Jane Doe #2's driver's license were designed as a ruse to keep them safe from D.A. In support of his ruse claim, Moothart noted that the document requesting a copy of Jane Doe #2's driver's license record did not have a number for her nondriver identification, but instead used an entry of 000XX0000. He further noted that the check number for payment of the $5.50 was listed as 0000. Moothart argues these incomplete entries indicate there was never any intention to submit the documentation to the IDOT and that, in fact, he did not do so. Further, Moothart testified there was, in fact, nothing he could do for Jane Doe #2 regarding her request for a driver's license, as her license was suspended for nonpayment of fines.

On our de novo review, we conclude the Board proved its sexual harassment claim by a convincing preponderance of the evidence. We note the commission made two credibility determinations: it found Jane Doe #2 credible, while it found Moothart's testimony incredible. Aside from the commission's credibility determinations, which we consider important, we are persuaded Moothart had unwanted sexual contact with Jane Doe #2 before he admittedly took her to a motel to engage in sexual intercourse. We therefore conclude the Board proved by a convincing preponderance of the evidence that Moothart engaged in sexual harassment in violation of rule 32:8.4(g).

Like the commission, we also find that Moothart violated rule 32:1.8(j) by having sex with a client. Moothart offers an unusual theory, claiming that oddities in the documents and the futility of the representation demonstrate the lack of an attorney–client relationship. It may well have been that Moothart regarded the documents as a ruse to provide a buffer against the current and prospective rage of a jealous client. The creation of false files, of course, would hardly generate confidence in Moothart as a lawyer, but we concede for the purpose of argument that it is possible that Moothart was devious enough to engage in such behavior.

In determining whether there was an attorney–client relationship, however, we have adopted a three-part test. The test generally requires that "(1) a person sought advice or assistance from an attorney, (2) the advice or assistance sought pertained to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agreed to give or actually gave the desired advice or assistance." *State v. Parker*, 747 N.W.2d 196, 203 (Iowa 2008) (internal quotation marks omitted); *see also Netti*, 797 N.W.2d at 599; *Kurtenbach*, 260 N.W.2d at 56 (stating that an attorney can give express or implied legal assistance "when [a] person seeking legal services reasonably relies on the attorney to provide them [services] and the attorney, aware of such reliance, does nothing to negate it"); *see generally* Restatement (Third) of the Law Governing Lawyers § 14, at 125 (detailing the formation of an attorney–client relationship, including when a client reasonably relies on the services of an attorney). Jane Doe #2 testified she believed Moothart was assisting her in connection with her driver's license. She had a document notarized, at Moothart's request, expressly stating that he was her lawyer in connection with her driver's license matter. Under these

circumstances, we conclude that an attorney–client relationship was established between Moothart and Jane Doe #2.

There is no persuasive reason to believe that Jane Doe #2 knew she was executing a false consent at Moothart's request. There is no evidence that Jane Doe #2 was sophisticated about driver's license matters, including those involving her own license. That is why we have lawyers. We think the documentary trail drives the balance well away from equipoise and establishes by a convincing preponderance of the evidence the existence of an attorney–client relationship at the time of the sexual intercourse. We therefore conclude that Moothart violated rule 32:1.8(j).

Finally, on the question of conflict of interest, we also agree with the commission that Moothart violated rule 32:1.7(a)(2). Moothart represented D.A. in a domestic abuse charge while at the same time he sought to establish or engaged in a personal relationship with the purported victim of the domestic abuse. An attorney cannot zealously represent the interest of a person accused of domestic abuse while seeking sexual favors from the alleged victim. Further, we note that by engaging in sexual relations with Jane Doe #2, Moothart increased Jane Doe #2's risk of exposure to angry outbursts from D.A. We conclude the Board established by a preponderance of the evidence that Moothart violated rule 32:1.7(a)(2) by engaging in a personal relationship that gave rise to a concurrent conflict of interest with an existing client.

**C. Jane Doe #3 (Sexual Harassment, Sexual Relations with a Client).** The Board charged Moothart with sexual harassment and sexual relations with a client in violation of rule 32:8.4(g) and rule 32:1.8(j), regarding his interactions with Jane Doe #3. Based on our de novo review of the entire record, we find the following facts.

At the time of the alleged transgressions, Jane Doe #3 was a woman in her early thirties who was a single mother of two young children. Moothart was court appointed to represent Jane Doe #3 in three misdemeanor matters and two child-in-need-of-assistance matters from September 2010 through December 2011. During this time, Jane Doe #3's children were in foster care.

Jane Doe #3 had an extensive history of mental-health and substance-abuse problems and was being treated for PTSD, anxiety, and depression. Moothart was well aware that her life was in turmoil.

During her first meeting with Moothart, Moothart questioned Jane Doe #3 extensively about her past work in the escort business and work as a prostitute. Jane Doe #3 felt uncomfortable with the questions and did not understand why Moothart was asking about these things as they had nothing to do with her case or with her children.

At this time, Jane Doe #3 was residing at a transitional living facility in an attempt to address the problems in her life. After being discharged early, she was placed at a residential treatment center. While a resident at the center, Jane Doe #3 was able to leave and meet with Moothart at his office several times.

During a subsequent meeting, Moothart complimented her appearance and asked her to "flash him." In response, Jane Doe #3 showed Moothart her breasts, which generated a crude sexual compliment from Moothart. Jane Doe #3 was uncomfortable with his requests; however, she complied because, as she stated, "Well, he was my lawyer. I mean, and I was in a pretty tough situation. Going to lose my kids."

In later attorney–client sessions, Moothart made additional crude sexual comments to Jane Doe #3. Eventually, Moothart scheduled a

meeting at his office with Jane Doe #3 after business hours. At Moothart's request, Jane Doe #3 performed oral sex on Moothart. He paid her $100 for doing so. After this incident, Moothart attempted to arrange further meetings with Jane Doe #3 to engage in sex acts for money, but she refused.

The sexual encounter bothered Jane Doe #3. She recognized she faced adverse consequences, including loss of reputation, possible jail time for prostitution, and negative consequences on her effort to be united with her children if she disclosed the events that had transpired. After some delay, she eventually told one of her caseworkers, R.S., and obtained assistance in requesting that Moothart withdraw from pending matters. Eventually Jane Doe #3 left residential treatment and had her children returned to her and the juvenile court cases involving her children closed.

R.S., an in-home caseworker for Children and Families of Iowa, corroborated Jane Doe #3's testimony about reporting the incident. While R.S. offered testimony about a prior consistent statement by Jane Doe #3 over Moothart's objection, we note such evidence was admissible because Moothart had attempted to impeach the testimony of Jane Doe #3. *See* Iowa R. Evid. 5.801(*d*)(1)(B).

Based upon our de novo review of the facts, we conclude that Moothart violated rule 32:8.4(g) when he made several crude sexual comments to Jane Doe #3, including asking her to flash him. Like the commission, we conclude these statements were " 'sexual advances, request for sexual favors, and other verbal [or] physical conduct of a sexual nature.' " *See Steffes*, 588 N.W.2d at 124 (quoting Black's Law Dictionary 1375). Further, Jane Doe #3 did not consent or welcome the sexual advances made by Moothart and was clearly not in a position to

do so, as she testified she was in a tough situation and was depending on Moothart so she could regain custody of her children.

We also conclude that Moothart violated rule 32:1.8(j) by giving Jane Doe #3 $100 in exchange for oral sex. There is no dispute that Moothart was Jane Doe #3's court-appointed attorney during this time.

**D. Jane Doe #4 (Sexual Harassment).** The Board charged Moothart with sexual harassment of Jane Doe #4 in violation of rule 32:8.4(g). Based on our de novo review of the entire record, we find the following facts.

In October 2010, Moothart was court appointed to represent eighteen-year-old Jane Doe #4 on a probation violation matter stemming from an OWI, first offense charge. During the course of his representation, Moothart met with Jane Doe #4 three times. During the first meeting in Moothart's office, Moothart made comments about her cleavage and asked her to pull her shirt down. Further, when Jane Doe #4 asked how much Moothart would charge for his legal services, his response was "it depends on how much cleavage you show me." Jane Doe #4 stated that as a result of Moothart's behavior, she "felt kind of embarrassed." She stated, "I didn't know really what to do. I didn't want to, I guess, risk having any issues with my case, so I just was compliant."

At the second meeting, Jane Doe #4 and Moothart met at the courthouse shortly before her hearing. Based on her last interaction with Moothart, Jane Doe #4 brought her mother and sister with her, as she "really didn't want to be in another situation like the [last] meeting." Jane Doe #4 asked that they be able to go into the meeting room with her and Moothart. Moothart refused to allow them to accompany her into the meeting. At the meeting, Moothart made more comments about her cleavage and again asked her to pull down her shirt.

The last meeting occurred immediately after the hearing, when Moothart again met privately with Jane Doe #4 in a courthouse conference room where he asked Jane Doe #4 if they could get drinks together and hang out in a hot tub. Because her case was over, Jane Doe #4 felt comfortable telling Moothart his actions and comments were inappropriate.

Based upon our de novo review, we conclude the Board proved by a convincing preponderance of the evidence that Moothart's behavior with respect to Jane Doe #4 violated rule 32:8.4(g). Under the facts we have found, Moothart's behavior clearly constitutes sexual harassment under this rule.[2]

**E. Jane Doe #5 (Sexual Harassment).** The Board charged Moothart with sexual harassment of Jane Doe #5 in violation of rule 32:8.4(g). Based on our review of the entire record, we make the following findings of fact.

Jane Doe #5 testified that she had known Moothart since she was ten or twelve. She began working at Moothart's law office in April of 2006 as a legal secretary and receptionist.

In 2006, while Jane Doe #5 was working for Moothart, he represented her in her dissolution-of-marriage case. In the office, Moothart had often made sexual comments which made her feel uncomfortable. These types of comments increased in frequency when he began representing her in her dissolution case. She testified Moothart would comment about her weight and how her body looked in different

---

[2]There is a question whether we should consider the similarity between Jane Doe #4's allegations and the allegations of other Jane Doe's. We need not decide this question, as even if we conclude that the acts only have a common thread and are not strikingly similar, *see Putman*, 848 N.W.2d at 12, it does not affect the result in this case. Even if we decline to view the claims as strikingly similar, the Board has met its burden to prove each of the charges by a convincing preponderance of the evidence.

outfits, about her breasts, and about other aspects of her body. He also asked her to perform lap dances and taped a $20 bill to the back of a cabinet door and said she was free to take it if she danced naked on the conference room table.

At the beginning of her employment, Moothart's driving privileges had been revoked as the result of his second conviction for OWI and Jane Doe #5 drove him to his appointments. On one occasion, while Jane Doe #5 was driving him to court, Moothart reached over and grabbed one of her breasts.

On another occasion while at work, Moothart asked Jane Doe #5 if she knew what a particular sex toy was. After responding she did not, Jane Doe #5 testified that he pulled up a picture on his computer and asked if he should order one so they could use it while having sex. She testified this made her "extremely uncomfortable."

During a Saturday spent putting together new office furniture, Jane Doe #5 was sitting at her desk and Moothart was on the ground connecting wires. He looked up her skirt and commented on her underwear.

Throughout Jane Doe #5's employment, Moothart would regularly make comments about female clients' breasts. She also testified that Moothart kept alcohol in the office and would offer it to certain clients.

On December 30, 2006, Jane Doe #5 met a client after hours to celebrate the client's case being over. While out together, Jane Doe #5 recalled being informed by the client of a highly inappropriate proposal of a sexual nature from Moothart. Jane Doe #5 claimed that this was the final straw and quit her job a few days later, in early January 2007.

In April 2009, Moothart was court appointed to represent Jane Doe #5 in a juvenile case involving her son with special needs. Although

Moothart testified that Jane Doe #5 wanted him to represent her in the matter, Jane Doe #5 denies that was her desire. During his representation from approximately May 2009 until the summer of 2011, Moothart continued to make comments about her breasts.

Based on our de novo review, we conclude that the Board established by a convincing preponderance of the evidence that Moothart violated rule 32:8.4(g) by injecting sexual commentary into the workplace and during the period of time when Jane Doe #5 was his client.

**V. Sanction.**

In order to determine the appropriate sanction in this case, we must consider:

> "[T]he nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances."

*Van Ginkel*, 809 N.W.2d at 108 (alteration in original) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008)). "The primary goal of attorney discipline is to protect the public, not to punish the attorney." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 487 (Iowa 2014). We are mindful there is no "standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morrison*, 727 N.W.2d 115, 119 (Iowa 2007) ("We give the discipline recommended by the Grievance Commission its due respect although the matter of sanction is solely within the authority of this court." (Internal quotation

marks omitted.)). Further, the form and extent of the sanction must necessarily be " 'tailored to the specific facts and circumstances of each individual case.' " *Van Ginkel*, 809 N.W.2d at 108 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks*, 759 N.W.2d 328, 332 (Iowa 2009)).

With these principles in mind, we now consider the question of the appropriate sanction in this case. Moothart acknowledges some level of discipline is warranted, but contends anything more than a thirty-day suspension will be devastating to his family and coworkers, including an office assistant and a newly-hired associate. We conclude a more severe sanction is appropriate. Moothart's conduct indicates a pattern of inappropriate behavior over many years that clearly harmed the women with whom he interacted as well as the profession he represented.

We have considered instances of an Iowa attorney's inappropriate sexual misconduct on a number of occasions and imposed sanctions ranging from a public reprimand to a three-year suspension. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767–68, 771 (Iowa 2010) (imposing three-month suspension for attorney on inactive status convicted of serious misdemeanor for window peeping); *Marzen*, 779 N.W.2d at 764, 769 (suspending attorney for six months when attorney engaged in consensual sexual relationship and accused of entering into sex-for-fees relationship); *McGrath*, 713 N.W.2d at 703–04 (imposing three-year suspension for attorney who sexually harassed at least two female clients, including exchanging legal services for sex); *Furlong*, 625 N.W.2d at 712–14 (suspending attorney for eighteen months for engaging in a sexual relationship with one client and encouraging her to withdraw her complaint with the Board and sexually harassing another client); *Steffes*, 588 N.W.2d at 124–25 (imposing two-year suspension for taking photographs of partially-clothed client under

pretext photos needed to document back injury); *Hill II*, 540 N.W.2d at 43, 45 (suspending attorney for twelve months for making inappropriate sexual advances toward client); *Comm. on Prof'l Ethics & Conduct v. Barrer*, 495 N.W.2d 756, 757 (Iowa 1993) (imposing two-year suspension for making obscene phone calls to teenage boys); *Comm. on Prof'l Ethics & Conduct v. Hill (Hill I)*, 436 N.W.2d 57, 58–59 (Iowa 1989) (suspending attorney for three months for accepting vulnerable client's offer to have sex in exchange for money); *Comm. on Prof'l Ethics & Conduct v. Vesole*, 400 N.W.2d 591, 591–93 (Iowa 1987) (imposing three-year suspension for repeated instances of indecent exposure to women); *Comm. on Prof'l Ethics & Conduct v. Durham*, 279 N.W.2d 280, 281, 285–86 (Iowa 1979) (reprimanding attorney for kissing and embracing inmate client).

Other jurisdictions have also dealt with similar attorney misconduct and have imposed sanctions ranging from a public reprimand to disbarment depending on the number of victims and interactions, as well as the severity of the alleged misconduct. *See, e.g.*, *People v. Good*, 893 P.2d 101, 102, 105 (Colo. 1995) (en banc) (per curiam) (suspending attorney for one year and one day after engaging in a consensual sexual relationship with a client); *In re Tenenbaum*, 880 A.2d 1025, 1026 (Del. 2005) (per curiam) (imposing suspension of three years after attorney sexually harassed clients and employees over a period of five to ten years); *In re Hammond*, 56 So. 3d 199, 201–05, 214 (La. 2011) (disbarring attorney who was found to have engaged in repeated unwanted and coercive sexual contact with a number of clients, most of whom were incarcerated inmates); *Attorney Grievance Comm'n of Md. v. Goldsborough*, 624 A.2d 503, 514 (Md. 1993) (imposing a minimum two-year indefinite suspension after attorney was accused of sexual harassment of three women and requiring the attorney to

"persuade [the court] that the conduct which necessitated his suspension will never be repeated"); *In re Discipline Action Against Griffith*, 838 N.W.2d 792, 792–93 (Minn. 2013) (suspending attorney associated with a law school for ninety days for engaging in unwelcome sexual conduct and contact with law student); *State ex rel. Okla. Bar Ass'n v. Miskovsky*, 938 P.2d 744, 746–47, 751 (Okla. 1997) (imposing sixty-day suspension after attorney made repeated sexual comments and advances with two separate prospective divorce clients); *In re White*, 611 S.E.2d 917, 918–19 (S.C. 2005) (per curiam) (suspending attorney for eighteen months after admitting to a pattern and practice of making sexual comments and suggestions to clients); *In re Yarborough*, 524 S.E.2d 100, 103–05 (S.C. 1999) (per curiam) (reprimanding attorney for making sexual advances and sexual comments to a client); *In re Discipline Proceedings Against Voss*, 795 N.W.2d 415, 422–23 (Wis. 2011) (per curiam) (suspending attorney for four years and eight months after finding the attorney engaged in an ongoing sexual relationship with a particularly vulnerable client and then attempted to intimidate her and her family to avoid punishment).

This case is different from those resulting in reprimands and short suspensions. Here, unlike in both *Monroe* and *Morrison* when the attorneys were suspended for thirty days after each had sex with one client, *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Monroe*, 784 N.W.2d 784, 787, 791 (Iowa 2010) (suspending attorney for thirty days for having a sexual relationship with a dissolution client when at the disciplinary hearing, the client testified she harbored no ill will toward the attorney and continued to regard him as a friend); *Morrison*, 727 N.W.2d at 117, 120 (imposing thirty-day suspension for attorney who admitted having sex with one client and acknowledged his conduct was unethical),

Moothart admitted to having sex twice with one client, and we have found he paid another client for sex and sexually harassed five women. The pattern and extent of Moothart's conduct is an unprecedented set of facts in Iowa and therefore warrants a suspension far beyond thirty-days.

This case presents numerous aggravating factors, most notably the vulnerability of the women with whom Moothart interacted and the pattern of such conduct. *See Templeton*, 784 N.W.2d at 770 (noting "we cannot overlook the serious, egregious, and persistent nature of Templeton's misconduct and the effect it had on his victims"); *Comm. on Prof'l Ethics & Conduct v. Tompkins*, 415 N.W.2d 620, 623 (Iowa 1987) (stating "the more egregious and persistent the conduct, the more debased the character of the offender"). Each woman believed she needed Moothart's professional help and all were in difficult, stressful situations. This is especially true with regards to Jane Doe #3, who was at risk of losing her children and had mental health concerns. *See Marzen*, 779 N.W.2d at 769 ("While many, if not most, people seek out lawyers for help in matters of personal importance and may, consequently, be vulnerable, the mental health condition of [the victim] at the time the sexual relationship began is an aggravating circumstance to consider in the imposition of discipline."). Further, there was an obvious power imbalance between Moothart and each woman, which he acknowledged and took full advantage of. *See generally State v. Johnson*, 149 Iowa 462, 468, 128 N.W. 837, 839 (1910) ("[A]n attorney who knowingly abuses the trust and confidence placed in him by his client is unfit for the profession and unworthy of a place therein."). Additionally, this was not an isolated incident. Moothart's actions show a specific pattern of conduct with respect to a number of victims, which we

consider an aggravating factor. *See Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Vinyard*, 656 N.W.2d 127, 132 (Iowa 2003) (noting pattern of misconduct is an aggravating factor).

This case is more analogous to those cases in which a lengthy suspension was imposed. *See McGrath*, 713 N.W.2d at 703–04; *Steffes*, 588 N.W.2d at 125; *Hill II*, 540 N.W.2d at 45; *Barrer*, 495 N.W.2d at 757; *Vesole*, 400 N.W.2d at 593.

The nature and extent of these ethical violations is very disturbing. Although we credit Moothart for his lack of prior disciplinary record, his voluntary work in connection with his daughter's school and extracurricular activities, his contributions to the local bar and legal organizations, and his general reputation in the Ames legal community, we are alarmed by the nature and pattern of his ethical violations. All five women sought Moothart's help with matters of personal importance. Preying upon their vulnerability, Moothart manipulated each woman for his own sexual gratification. We therefore think a lengthy suspension is warranted to provide adequate deterrence and to protect future potential clients and the reputation of the bar, particularly in light of the seriousness of the offenses.

Therefore, we find the appropriate sanction for Moothart's conduct is suspension of his license to practice law indefinitely with no possibility of reinstatement for thirty months. Prior to any application for reinstatement, Moothart must provide this court with an evaluation by a licensed health care professional, including proof of participation in a counseling program specific to sexual harassment, verifying his fitness to practice law. *See Steffes*, 588 N.W.2d at 125 (noting "as a condition of license reinstatement, Steffes [was] required to demonstrate that he . . . completed formal training in sensitivity to sexual harassment issues to

prevent a reoccurrence of the conduct that resulted in his suspension");
*see also Templeton*, 784 N.W.2d at 771.

### VI. Conclusion.

For the above reasons, we suspend Moothart's license to practice law in this state for an indefinite period of time with no possibility of reinstatement for thirty months. Additionally, Moothart must provide this court with an evaluation by a licensed health care professional, including proof of participation in a counseling program specific to sexual harassment, verifying his fitness to practice law.

This suspension shall apply to all facets of law. Iowa Ct. R. 35.13(3). Moothart shall provide all of the notifications required by Iowa Court Rule 35.23. The costs of this proceeding are taxed against Moothart pursuant to Iowa Court Rule 35.27(1).

**LICENSE SUSPENDED.**