# IN THE SUPREME COURT OF IOWA

No. 20–1004

Submitted January 20, 2021—Filed February 19, 2021

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**STEPHEN WARREN NEWPORT,**

Appellant.

On review of the report of the Iowa Supreme Court Grievance Commission.

Grievance commission recommends suspension of an attorney for violations of ethical rules in the representation of two clients. **LICENSE SUSPENDED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., and McDermott, J., took no part in the consideration or decision of the case.

Tara van Brederode and Crystal W. Rink, Des Moines, for appellee.

John O. Moeller, Davenport, for appellant.

**MANSFIELD, Justice.**

This attorney disciplinary case requires us to perform a de novo review of critical facts that divided the grievance commission three-to-two. An attorney was charged with violating Iowa Rule of Professional Conduct 32:8.4(g) for sexually harassing two clients. He was also charged with committing indecent exposure and sexual assault against one of those clients in violation of rule 32:8.4(b). A criminal trial occurred, in which a jury acquitted the attorney of both of those offenses; nonetheless, the grievance commission found three-to-two that the attorney had committed both crimes. All five of the commission members found the attorney had engaged in sexual harassment.

After a careful review of the evidence, we find the sexual harassment proved but the criminal conduct not proved by a convincing preponderance of the evidence. In other words, as to the violations, we agree with the two commission members in dissent rather than the three in the majority. For the sanction, we suspend the attorney's license indefinitely with no possibility of reinstatement for one year based upon the acts of sexual harassment.

### I. Facts and Procedural History.

The following factual discussion contains considerable detail. We believe it is necessary to explain why we reach our stated conclusions.

Stephen Newport is 69 years old. He has been practicing in the Quad Cities since 1978. At the times relevant to the case, he maintained a law office in Bettendorf.

**A. Jane Doe #1.** Jane Doe #1 has training as a certified nurse's aide and worked in that field for about ten years. Her first encounter with Newport came when he was appointed to represent her in a child-in-need-of-assistance matter from 2003 to 2005. Later, from 2013 to 2014,

Newport handled a child custody matter for her, and she paid him $500. In 2015, Doe #1 hired Newport on a contingent fee basis to represent her in a personal injury case against a self-storage company. Doe #1 maintained she had suffered injuries as a result of a door on a storage unit coming down and hitting her neck and upper shoulder.

The case was scheduled to go to trial on January 28, 2018. On January 3, the defense finished deposing Doe #1's attending physician and showed him records indicating that Doe #1 had been involved in a car accident in 2011 and had been undergoing regular chiropractic treatment for neck and shoulder pain. The physician testified that Doe #1 had not previously disclosed this information, and in light of it, he was no longer able to say that Doe #1's current complaints of pain were attributable to the self-storage accident. In Newport's view, this weakened the case significantly and made settlement a priority.

In the afternoon on the 18th, Doe #1 had a series of calls with Newport. According to Doe #1, she made plans to meet with Newport the next day. Doe #1 recalls that on the morning of the 19th, she went to his office in Bettendorf in the morning after dropping off her children at school. She discussed with Newport whether to settle the case or take it to trial. Doe #1 called her mother in Arizona, who joined the discussion as a third participant on speakerphone. During this meeting, Newport began exchanging settlement figures with defense counsel.

Doe #1 recalls that at some point Newport got up to use the restroom. When he returned, he closed the door to the office and sat down in the chair next to Doe #1. Newport showed Doe #1 family pictures of grandchildren that were on his cellphone and then talked about his

"pancreatic cancer."[1]  He said that "the doctor put this weird device in me, and it causes me to have erection issues."  He said that "his abdomen was really bizarre."  He asked Doe #1 if she wanted to see it, got up and pulled up his shirt, and showed Doe #1 a device that was protruding in the area of his abdomen.

In Doe #1's account, she turned back to her phone for a moment, and when she looked again, Newport had undone his pants and dropped his pants and underwear.  Newport stated he has a hard time getting an erection.  Doe #1 saw him massaging his penis.  Newport told Doe #1 she needed to feel "this tubing that goes from the scrotum," which is "really weird."  She declined the offer, but Newport then grabbed her hand and placed it on his scrotum area and guided her so she could feel the tubing.  Newport told Doe #1 that the device was "like a pump that was to help him get an erection."  Doe #1 grabbed her hand away.  She later testified, "I'm in shock, I'm in fear, and I feel invaded."  She told Newport he needed to pull his pants up or someone was going to come in and catch him.  Newport laughed and said, "It's just us, and the door's locked."

According to Doe #1, Newport (who has gray hair on his head) "had mentioned about how his pubic hairs were red, and that's where his granddaughter had gotten her red hair from."  Newport then said, "Look," and tried to show her the red pubic hair he had previously told her about.  Doe #1 turned away.

At this point, according to Doe #1, Newport straightened his clothing and told Doe #1 that opposing counsel would probably not be reaching out again soon "because it's around lunchtime."  Doe #1 left Newport's office and drove to a close friend's house to babysit her infant.  In her hearing

---

[1]It is not disputed that Newport actually had been diagnosed with prostate cancer.

testimony, Doe #1 identified a series of phone calls on her phone records as coming from Newport that afternoon and concerning the subject of settlement. A settlement was reached in the afternoon for $25,000, with the understanding that after liens and attorneys fees, Doe #1 would receive $7500. Newport later informed her that she would actually receive $8000 because the defendant agreed to cover a deposition cost.[2] Doe #1 also recalls that over the phone that afternoon Newport said, "Deal's done, drop your clothes off, and you can give me a blow job."

Several days later, after her mother arrived in town, Doe #1 went to the Bettendorf police with her mother and reported Newport's conduct. Doe #1 admitted she was unhappy with the terms of the settlement. Given the amount of money she was receiving, she did not believe Newport should get any fee for his work on the case. In her police report, she informed the officer that when Newport lifted the shirt, she could see the device coming out of his abdomen. She informed the officer that Newport had grabbed her left hand and put it on his scrotum.[3]

With a detective listening in, Doe #1 made a recorded phone call to Newport in February. The call began with issues relating to finalizing the settlement. Newport mentioned that Doe #1 needed to come in and sign a Medicare release to finalize the settlement. After several minutes, Doe #1 raised the subject of "sexual favors":

> [Doe #1]: Well, what about the sexual favors and stuff.
> SN: Sexual favors, what do you mean? You mean . . .

---

[2]Doe #1 agreed that Newport was entitled to a 30% fee under the fee agreement. However, Newport agreed to reduce his fee to approximately $4000 and that all of it would go to the other attorney who had associated with him on the case. At the time of hearing, Doe #1 was still disputing any attorney's entitlement to a fee.

[3]She confirmed this in her hearing testimony, but in her deposition in the criminal case, she said it was the right hand.

[Doe #1]: Well, what you were talking about.  SN: You'd give me a blow job you mean?

[Doe #1]: Yeah, that's what you mentioned.  SN: Yeah?  Don't worry about it, we'll figure it out.

Doe #1: Ok? Like when are we going to figure it out?  SN: I don't know.  I'm not worried about it.  You're not going anywhere.

Doe #1 then moved to the subject of Newport allegedly having exposed himself:

[Doe #1]: When you pulled your pants down and . . . that shocked me.  SN: That what?

[Doe #1]: When you pulled your pants down, you showed me your . . . from your surgery?  SN: Oh.

[Doe #1]: I was concerned about you and just wondering what type of procedure that was.  SN: Yeah.

[Doe #1]: It just had me confused.  SN: What's your schedule like today?

[Doe #1]: Um, my daughters have an appointment.  They get out early today.  SN: Ok.  What time's that?

After discussing scheduling some more, Doe #1 turned to Newport's allegedly having forced her to touch his genitals:

[Doe #1]: Well . . . you remember how you had me touching you and stuff?  SN: Huh?

[Doe #1]: Do you remember when we were talking in your office?  SN: Yeah.

[Doe #1]: And just waiting to hear from [opposing counsel] for the settlement and stuff and you were talking about your family and then you were talking about your surgery you had that I didn't know you had, and then you had me touch you and stuff.  Do you remember that?  SN: (Unintelligible).  No.

[Doe #1]: Yeah, when you showed me your, what was that, tubing sticking out of your stomach.  SN: Tube sticking out of stomach?  I don't know.  We've got to figure out when you can come in and sign this . . .

More scheduling discussion ensued. After several more minutes, the call ended.

Under the guidance of the same detective, Doe #1 also secretly recorded several personal meetings with Newport in his office. Newport made no incriminating admissions in those meetings.

A search warrant was served, and Newport's genital area was photographed. The photographs confirmed that he had red pubic hair. However, it was clear that Newport had no device protruding out of his abdomen.

At the hearing, Doe #1's close friend testified as a witness for Newport. Doe #1's phone showed two phone calls and a large number of texts to her on January 19, 2018. The friend said that Doe #1 arrived midmorning to babysit on the 19th. Doe #1 made no complaints to her close friend about sexual assault or sexually offensive conduct.

Newport himself testified at the hearing. He explained that he suffers from Parkinson's disease. Additionally, his wife testified that he suffers from myasthenia gravis, an autoimmune disorder, and that he is going through a cognitive decline.

Newport claimed not to have met with Doe #1 at all on January 19, although he acknowledged his answer to the Board's complaint stated that he had.[4] He acknowledged that since his prostate cancer surgery, he has erection issues. He denied discussing those issues with Doe #1.

Newport of course did not dispute making the statements on the recorded phone call, but he emphasized that "she kept trying to get off the subject, and I tried to keep her back on the subject." He said he was focused on getting the settlement done. He told a commission member he

---

[4]Newport's hearing testimony was that Doe #1 came in to the office on the 19th to sign a release related to the settlement negotiations but he did not actually meet with her that day.

had never before used the term "blow job" in any fashion with a female client. He acknowledged he has a grandchild with red hair but denied telling Doe #1 that he had red pubic hair. He denied that Doe #1 had ever touched his scrotum.

Newport explained that the device in question was an artificial urinary sphincter that is entirely inside the body. It is not a sexual device. Part of the device is located within the abdomen; none of it is visible outside. It is "possible" he discussed this device with Doe #1. Newport does have a surgical scar on his abdomen.

In connection with his conduct toward Doe #1, the Scott County Attorney charged Newport with third-degree sexual abuse, indecent exposure, and prostitution. *See* Iowa Code §§ 709.4, 709.9, 725.1 (2019). A jury trial occurred, and Newport was acquitted of sexual abuse and indecent exposure; the jury hung on the prostitution charge. At a second trial, Newport was acquitted of prostitution.

**B. Jane Doe #2.** The other client was Jane Doe #2. She was represented by Newport between approximately 2012 and 2014 in a child custody matter. She contacted the Bettendorf police after Newport's criminal charges reached the newspaper and she learned of them.

Doe #2 recalled several incidents of improper conduct by Newport. On one occasion, she owed Newport around $300 and asked if it was okay if she gave him a check. Newport responded, "Would you like me to just shut the door?" and chuckled. Doe #2 interpreted this as a proposal to pay him with something other than money; she gave him the check.

On a second occasion, Newport and Doe #2 were walking together in a parking lot. Newport mentioned while walking that he had a hernia in his groin. He asked Doe #2 if she wanted to check out the hernia, noting

that she was in nursing school. Newport was laughing as he said this, but Doe #2 felt that this was "gross and degrading."

Third, Doe #2 recalls that as they were winding up the custody matter, they were together in Newport's office about to speak to Doe #2's ex-husband on the phone. Newport came around his desk, half sat on the desk, and said, "[S]hould I ask him if you can pay for this with sex?" Doe #2 related that she "was lost," looked down, and "was just so embarrassed."

The Board filed a complaint against Newport on October 16, 2019. It alleged that he violated Iowa Rules of Professional Conduct 32:8.4(b) and 32:8.4(g). Newport answered, and the matter was heard by the grievance commission on February 20 and 21, 2020. At the conclusion of the hearing, the commission found unanimously that Newport had sexually harassed both Doe #1 and Doe #2. Additionally, a majority of the commission—three members—found that Newport had exposed himself to Doe #1 and forced her to touch his scrotum. Two members dissented from this finding. The majority concluded that Newport's law license should be suspended for two years; the dissenters differed between themselves as to the appropriate sanction, with one endorsing a six-month suspension and the other endorsing a one-year suspension.

## II. Standard of Review.

"We review attorney disciplinary proceedings de novo." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 144 (Iowa 2018) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Silich*, 872 N.W.2d 181, 188 (Iowa 2015)). "The Board has the burden of proving the attorney's misconduct by a convincing preponderance of the evidence." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Lubinus*, 869 N.W.2d 546, 549 (Iowa 2015). This standard "places a burden on the Board that is higher than

the burden in civil cases but lower than the burden in criminal matters." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Eslick*, 859 N.W.2d 198, 201 (Iowa 2015) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 470 (Iowa 2014)). "We give the findings and recommendations of the commission respectful consideration . . . ." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Lynch*, 901 N.W.2d 501, 506 (Iowa 2017).

### III. Ethical Violations.

**A. Rule 32:8.4(g).** Iowa Rule of Professional Conduct 32:8.4(g) makes it professional misconduct for an attorney to "engage in sexual harassment or other unlawful discrimination in the practice of law." Sexual harassment is broadly defined and includes conduct that may not give rise to civil liability. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 604 (Iowa 2015). It includes "any physical or verbal act of a sexual nature that has no legitimate place in a legal setting." *Id.*; *see also Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 124 (Iowa 1999) (en banc) (defining "sexual harassment" as including "sexual advances" and "requests for sexual favors" (quoting *Sexual Harassment, Black's Law Dictionary* (6th ed. 1990))).

We agree with the commission that Newport sexually harassed both Doe #1 and Doe #2. Doe #2's testimony was persuasive to the commission and is persuasive to us. Doe #2 came forward after a period of years; she had nothing to gain by doing so. Newport points out that she owed him money for legal services rendered, but if anything, that would make her more reluctant to get involved unless her story were true. Newport also testified that it would have been "suicide" for him to actually ask Doe #2's ex-husband if Doe #2 could pay Newport by giving him a "blow job." Newport's point seems to be that he could not have made such a suggestion seriously. But sexual harassment occurred whether the

suggestion was serious or not. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Watkins*, 944 N.W.2d 881, 890–91 (Iowa 2020). As for Doe #1, the recording alone confirms his sexual harassment of her.

**B. Rule 32:8.4(b).** Iowa Rule of Professional Conduct 32:8.4(b) makes it an ethical violation when an attorney "commit[s] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Indecent exposure to a client and sexual abuse of a client undoubtedly would fall within this rule. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 590 (Iowa 2015) (noting the added significance when a crime is committed against the client). Furthermore, a criminal conviction is not a prerequisite. "It is the commission of a criminal act reflecting adversely on a lawyer's fitness to practice law, not the act of getting caught committing a crime, which constitutes a violation of this rule." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Taylor*, 887 N.W.2d 369, 378 (Iowa 2016). An attorney can violate this rule "even if the authorities never charged the attorney with a crime," *id.*, or (as here) were unsuccessful in obtaining a conviction.

However, like the two dissenters on the commission, we do not find the indecent exposure and sexual assault allegations established by a convincing preponderance of the evidence. Our view of the record largely tracks that of the dissenters below. Although we have concerns about Newport's testimony, we also have a number of concerns about Doe #1's testimony.

First, Doe #1 said repeatedly that she saw tubing coming out of Newport's abdomen. She told this to the police, she said this in the recorded phone call quoted above, and she so testified in her deposition. (At the commission hearing, Doe #1 testified that the device was pushing out inside Newport's abdomen but did not break the skin.) In fact, there

was no external device. Second, Doe #1 was wrong about the nature of the device; it was implanted to address postsurgery incontinence, not impotence. Incontinence can be an embarrassment for a man who undergoes prostate removal; it seems odd that Newport would have wanted someone to touch this urinary control device. Third, although Doe #1 correctly identified the color of Newport's pubic hair, she said that Newport had previously told her the color of his pubic hair when he showed her a photograph of a grandchild. Thus, we cannot rely on Doe #1's knowledge of his pubic hair color to establish that she saw Newport expose himself. Fourth, as noted by the dissenters, Doe #1 had

> a long-time, close, female friend. The two regularly communicate[d] many times per day, by text message, by voice calls, and in person. [Doe #1] visited this friend at the friend's home later the same day as the purported incident. [Doe #1] was upset, but only about the settlement to which she had agreed. She said nothing to her confidant about any purported sexual assault or sexually offensive behavior.

Fifth, although Newport's responses on the recorded phone call are consistent with his having previously proposed an exchange of fees for sex, he said "no" when Doe #1 asked if he remembered having her touch him. Finally, Doe #1 could have had a motive to overstate the extent of Newport's misconduct. It is undisputed that Doe #1 was very disappointed in the outcome of her personal injury case; her lack of candor with her own physician had damaged that case. Doe #1 wanted to have everything remaining after the payment of liens go to her, with no share going even to the other attorney who worked on the case.

We are not saying we found Newport's testimony credible. His sweeping denials did not ring true to the commission and do not ring true to us. His mental condition gives us added reason to question those denials.

In sum, on our de novo review of the record, we are unable to conclude by a convincing preponderance of the evidence that Newport exposed himself to Doe #1 and forced her hand to his scrotum. Yet even if Newport only discussed a series of highly inappropriate topics, including his implanted device, his sex drive, and the color of his pubic hair, those discussions violated rule 32:8.4(g). Newport repeatedly subjected female clients to sexual harassment.[5]

### IV. Sanction.

"There is no standard sanction warranted by any particular type of misconduct. Though prior cases can be instructive, the sanction warranted in a particular case must be based on the circumstances of that case." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Hier*, 937 N.W.2d 309, 317 (Iowa 2020) (citation omitted) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 880 (Iowa 2012)). Nevertheless, "[w]e seek to 'achieve consistency with prior cases when determining the proper sanction.'" *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Crotty*, 891 N.W.2d 455, 466 (Iowa 2017) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010)). "Our primary purpose for imposing sanctions [is] not to punish the lawyer but to protect the public." *Hier*,

---

[5]The dissenters in the commission concluded that the rule 32:8.4(b) charge had not been proved based on the Board's failure to establish indecent exposure or sexual abuse by the required convincing preponderance of the evidence. There is no indication below that the commission viewed Newport's discussions of sexual favors as sufficient to establish the crime of prostitution for rule 32:8.4(b) purposes. The Board argues on appeal that Newport committed prostitution in violation of Iowa Code section 725.1(2)(*a*) when he allegedly told Doe #1 on the phone, "Deal's done, drop your clothes off, and you can give me a blow job." On our de novo review, although we have no difficulty finding that Newport made repeated, harassing comments of a sexual nature, we do not find by the required convincing preponderance of evidence that Newport made statements sufficiently direct and concrete to constitute the crime of prostitution, defined as "purchas[ing] or offer[ing] to purchase another person's services as a partner in a sex act." *See* Iowa Code § 725.1(2)(*a*).

937 N.W.2d at 317 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 542 (Iowa 2013)).

Our recent sexual harassment cases have involved sanctions ranging from six months to three years.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Steffes*, we suspended an attorney indefinitely with no possibility of reinstatement for two years after he engaged in sexual harassment by taking nude photographs of a client to satisfy his prurient interests. 588 N.W.2d at 124–25. There were a number of aggravating factors, including that the attorney "tried to get his client to destroy the photographs—uncontrovertible evidence of his professional impropriety." *Id.* at 125.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Furlong*, we imposed an eighteen-month suspension on an attorney who sexually harassed three clients. 625 N.W.2d 711, 712, 714 (Iowa 2001) (en banc). The conduct was egregious and included uninvited and unwelcome digital penetration of a client's vagina, uninvited kisses, uninvited back rubs and inappropriate comments. *Id.* at 712. The attorney also had a lengthy consensual relationship with one of the clients and tried to dissuade that client from following through on her complaint with the disciplinary authorities. *Id.* In addition, this attorney had paid a settlement to one of the clients to fend off a sexual harassment lawsuit. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. McGrath*, we suspended an attorney for at least three years who had actually exchanged sex for fees with one client and attempted to exchange sex for fees with another. 713 N.W.2d 682, 703–04 (Iowa 2006). Both clients were

extremely vulnerable; they were involved in child custody and visitation matters with their children at stake and no financial means. *Id.* at 703.

In *Moothart,* we suspended an attorney for thirty months (two and a half years) who had sexually harassed four clients and an employee. 860 N.W.2d at 608–09, 611, 613, 617. The attorney made crude comments about all the women, requested that the four clients show him their breasts, and groped the employee's breast. *Id.* at 607–14. The attorney plied two of the women with alcohol, one of whom was a college student, before making sexual advances. *Id.* at 607–08, 610. The attorney also had sex with two of the clients, paying one of them for doing so. *Id.* at 610, 612.

In *Iowa Supreme Court Attorney Disciplinary Board v. Stansberry*, we sanctioned an assistant county attorney with a one-year suspension after he engaged in sexual harassment and other misconduct by secretly photographing female coworkers' underwear in the office and photographing and stealing underwear from one coworker's home. 922 N.W.2d 591, 594–95, 601 (Iowa 2019). The attorney used false pretenses to get into the home of this coworker, whom he supervised; he lied to law enforcement when confronted with his actions; he was convicted of theft and criminal trespass; and his misconduct forced the coworker to have to quit and relocate to a different county. *Id.* at 594.

Most recently, in *Iowa Supreme Court Attorney Disciplinary Board v. Watkins,* we imposed a six-month suspension on an attorney who engaged in sexual harassment of two women employees by making numerous demeaning sexual remarks and showing them naked photographs of his wife. 944 N.W.2d at 884–85, 888, 894.

In our view, the misconduct in this case does not reach the level of the misconduct in *Furlong, McGrath,* or *Moothart.* Those cases involved

additional predatory conduct. On the other hand, unlike in *Watkins*, the victims here were clients, and the misconduct went beyond degrading the victims to proposing fees for sex. Comparisons to the other cases are more difficult because the conduct is different in kind.

We agree with the commission that Newport's pending application for retirement is a mitigating factor. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Goedken*, 939 N.W.2d 97, 109 (Iowa 2020).[6] So is his general cooperation. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Jacobsma*, 920 N.W.2d 813, 821 (Iowa 2018). We also agree with the commission that Newport's pattern of misconduct—involving similar harassment years apart—is an aggravating factor. *See Moothart*, 860 N.W.2d at 617. An additional aggravating factor is the vulnerability of Doe #2. *Id.* When asked why she did not fire Newport after he sexually harassed her, Doe #2 explained,

> Well, I had no money. It was really important to finish up my child custody case. You know, I could hardly afford rent, let alone hire another attorney with a huge deposit. The idea of that was just impossible.

Yet another aggravating factor is Newport's experience. *See Goedken*, 939 N.W.2d at 108.

Weighing the attorney misconduct in this case, our precedents, the aggravating and mitigating factors, and other relevant considerations, we conclude that a suspension of not less than one year is warranted. As between the two dissenters, this was the more severe sanction recommended.

---

[6]The Board argues that Newport's retirement should be discounted because the application was filed shortly before the hearing in this case. We disagree. *See Goedken*, 939 N.W.2d at 109 (finding it to be a mitigating factor that an attorney was "currently seeking to retire after a lengthy legal career" and had "taken steps toward this retirement by closing estates or withdrawing from matters").

**V. Disposition.**

Newport's license to practice law in the State of Iowa is suspended with no possibility of reinstatement for one year from the filing of this opinion. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Newport must comply with all notification requirements of Iowa Court Rule 34.24. Should he desire to resume practicing law, Newport must file a written application for reinstatement of his license. *See id.* r. 34.23(1). Newport must comply with all applicable requirements of Iowa Court Rule 34.25 for reinstatement and establish he has not practiced law during the suspension period. The costs of the proceeding are taxed to Newport pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Christensen, C.J., and McDermott, J., who take no part.